[687 NYS2d 7]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v KEITH KEEN, Appellant.

First Department, February 25, 1999

**APPEARANCES OF COUNSEL**

*Julia P. Kuan* of counsel (*Richard M. Greenberg,* attorney), for appellant.

*Carol A. Remer-Smith* of counsel (*Mark Dwyer* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

**OPINION OF THE COURT**

NARDELLI, J. P.

Defendant was convicted of the depraved indifference murder of Sheldon Brown and of related weapons counts in a dispute over entry without payment into a social club where defendant was working. There was eyewitness testimony from Delroy and Leon McLean that defendant shot and mortally wounded Brown because Brown had "dissed" him. Each brother had previously seen defendant at least 50 times, at clubs, other

parties, or in the park. The brothers also testified that after firing at Brown, defendant got another gun and pointed both guns at Delroy and said: "Who want it next? Who want it next? I should give it to you right now!" A short time later while assisting the semiconscious and mortally wounded Brown outside the club, Leon saw defendant and said: "You shot our friend!" and defendant responded by reaching for the guns in his waistband and then drove away. Gwendolyn Barton heard defendant argue with Brown and his friends and saw defendant and another engage in a shoving match with the McLeans and Brown seconds before the shot was fired. On the eve of her trial testimony, defendant telephoned her to suggest she testify that he had not been present when the shot was fired.

Defendant testified that he lived with Charlotte Jordan and their infant son at the time of the shooting, and that they had a "very good relationship." He said he knew Glen Stevens, who managed clubs part time, as a "close friend" and Stevens' wife, Gwendolyn Barton. He testified he helped Stevens in the clubs but was not paid or employed by Stevens. Defendant testified that, on the night of the shooting, he was in the hall arguing with Charlotte Jordan, when he saw the McLeans trying to push their way into the club and heard a shot. He grabbed Jordan and pushed her into the club. Defendant also testified that he had finished high school and accumulated 65 credits at Hunter College with a cumulative average of 3.76 towards a bachelor's degree in "delinquent psychiatry." However, there was no record in the Registrar's office that defendant had ever attended Hunter at all. Indeed, defendant also lied during his testimony about his mother's maiden name, his own name, and his date of birth, as shown by the testimony of his maternal aunt. He even contradicted other portions of his testimony and an earlier videotaped statement he had made.

Defendant's guilt was proven beyond a reasonable doubt by overwhelming evidence and his own self-serving testimony was properly rejected by the jury.

■ We find no violation of defendant's *Antommarchi* (*People v Antommarchi*, 80 NY2d 247) rights since he waived these rights through his attorney, voluntarily on the record in open court. The statement by counsel was made in defendant's hearing without the jury present. There was no statutory or other legal requirement that defendant be informed by the court of the right to attend and take part in the voir dire, when such right has been waived through counsel (*see, People v Vargas*, 88 NY2d 363, 373-374). Thus, in *People v Santana* (247 AD2d

201, *lv denied* 91 NY2d 977), we found that "[m]erely because a waiver is expressed by counsel does not render it unknowing if the record demonstrates that the defendant was made aware of his rights" (*see also, People v Diaz,* 246 AD2d 397, *lv denied* 92 NY2d 851; *People v Holliday,* 241 AD2d 399; *People v Davis,* 194 AD2d 437, *lv denied* 82 NY2d 716). The citation for this proposition was *People v Holliday (supra).* In that case, we expressly found that: "A waiver is not invalid merely because it is expressed by counsel rather than in defendant's own voice [citation omitted] particularly when made in defendant's presence." (*Supra,* at 400.) We remanded in that case for a reconstruction hearing *only* because the court did not simply accept the waiver but engaged in a colloquy with counsel in defendant's presence, stating that if counsel had any " 'concerns' " he/she would have " 'time to confer with [defendant] if you want to explore it.' " (*Supra,* at 400.) While we found that this colloquy was not so "deficient" as to warrant reversal, we did find it to be somewhat "ambiguous" and, therefore, remanded the matter for a hearing. (*Supra,* at 400.) In this case, however, rather than making an "ambiguous" statement, the court asked defendant's counsel "will [your] client waive his right to be present when I call the members of the prospective panel to the bench?" and counsel unequivocally said "Yes." The court then noted in defendant's presence, "Defendant waived his *Antommarchi* right to be present at the bench during the time we question the members of the panel."

*People v Bennett* (238 AD2d 138) is not inapposite. In *Bennett (supra,* at 138), defendant's counsel advised him of his rights in open court and told him he had a right to be there but added " '[i]t creates more of a problem than anything else.' " Counsel then told his client: " 'If there is anything substantive that they want to discuss about the case or about you, I will request that you be brought up.' " (*Supra,* at 138.) Based on these facts, we found that the conversation *dealing with waiver* between counsel, the court and defendant revealed "an ambiguity as to the validity and scope of such waiver." (*Supra,* at 139.)

Unlike *Bennett,* there was *no* ambiguity in this case. Counsel did not explain the right to defendant in court and get his waiver at the same time, as in *Bennett,* but presumably discussed it with defendant before waiving the right on his behalf in defendant's presence. This presumption is not only in accord with the "presumption of regularity." It is also supported by defendant's subsequent conduct. He did not raise

any objection to his absence at sidebar colloquies during the three-day voir dire, which encompassed four separate groups of jurors. As we have held, "since both he and counsel remained silent after the waiver was accepted by the court, the waiver was effective" (*People v Spruill*, 212 AD2d 381, 382, *lv denied* 85 NY2d 943).

■ The court's delivery of a missing witness charge against defendant does not warrant reversal. The "missing witness," Charlotte Jordon, defendant's ex-girlfriend and the mother of his child, told a defense investigator that she and defendant were standing side by side in the club hallway when they heard a shot from 50 feet away, and after defendant investigated and found someone had been shot, they left. Jordan was subpoenaed by the defense and appeared at an ex parte bench conference with defense counsel and the court. She confirmed that her exculpatory statements were not accurate. Thereafter, defendant testified that he and Jordan were at the end of the hallway when they heard the shot. The dissent correctly states the law that: "A witness is considered to be in the control of the party to whom he or she is favorably disposed. A demonstration that the witness in question is not under such control is sufficient to defeat the request for a missing witness charge (*People v Gonzalez*, 68 NY2d 424, 428)."

However, after the court noted it would give a missing witness charge as to Charlotte Jordan, defense counsel objected, "Wait one second. Charlotte is not within the exclusive control of the defendant. The District Attorney knows where Charlotte is." Thereafter he said, "But the District Attorney could have called her." The District Attorney correctly stated the law when he responded, "Availability is not control. She is someone who would be called by the defense. She is the mother of his child." While the dissent asserts that there is "no support" in logic, experience or law for a presumption that a person's status as a parent of a child together with the defendant places her or him under the "control" of the other parent, the fact remains that Charlotte Jordan appeared under subpoena from the defendant, and when she indicated she would not testify as defendant expected, counsel declined to call her. Defendant was, however, called by his counsel and testified as to the presence of Charlotte Jordan and as to facts Jordan had *earlier*, out of the hearing of the jury, said were untrue. While the dissent asserts that the relationship between defendant and Jordan was one of "hostility," the record does not demonstrate any active hostility, but rather that the parties were no longer involved in

an intimate relationship. This would not be enough to remove Jordan from defendant's "control." "A missing witness charge would be appropriate however, if it is demonstrated that the party had the physical ability to locate and produce the witness, and there was such a relationship, *in legal status or on the facts*, as to make it natural to expect the party to have called the witness to testify in his favor" (*People v Gonzalez, supra,* at 429 [emphasis added]). On the facts before it, it was proper for the court to find that it would be natural to expect defendant to call Jordan to corroborate his sworn testimony.

This also disposes of the dissent's contention that the "error" of the court in giving an adverse inference charge as to Jordan was not harmless. Even if such a charge can be considered error, it was harmless because of the fact that *defendant testified* as to what Jordan did and saw. The prosecutor therefore was entitled to impeach this testimony even without a missing witness charge by the court and comment in turn on defendant's version of the facts and on the fact that the mother of defendant's child, who was present at the scene of the crime, did not appear to corroborate defendant's testimony. A fortiori, there was no prejudice to defendant from the delivery of this innocuous instruction to the jury, which accurately assessed the witness's availability to defendant and defendant's control over his ex-girlfriend, the mother of his child. After all, the jury was only told that: "However, from the failure of the defendant to call Charlotte Jordan the law permits but does not require you to infer, if you believe it proper to do so, that if Charlotte Jordan had been called as a witness by the defendant and had testified her testimony would not have supported the testimony of the defendant. On this issue you may only infer so *if you are satisfied that Charlotte Jordan was under the control of the defendant* and was available to be called by the defendant if he had wished to do so." (Emphasis added.)

The jury was capable of discerning whether Ms. Jordan was under the control of defendant and her reason for not testifying. In view of the plethora of lies and falsehoods that defendant was shown to have told under oath, including his "attendance" at Hunter College, and in light of the overwhelming evidence of his guilt, there was no possibility that this simple "adverse inference" charge had any prejudicial effect on the jury.

Accordingly, the judgment of the Supreme Court, New York County (Howard Bell, J.), rendered September 14, 1995, convicting defendant, after trial by jury, of murder in the

second degree and criminal possession of a weapon in the second and third degrees and sentencing him, as a second felony offender, to terms of 20 years to life, 4 to 8 years and 2 to 4 years, respectively, should be affirmed.

WALLACH, J. (dissenting). Defendant was convicted of murder based upon his alleged actions in connection with his employment as a security guard and sometime bartender at a late-night Manhattan social club. The prosecution's case offered testimony that on the night of January 14-15, 1994, at about 2:00 A.M., four men sought admission to the club without paying the entrance fee. A pushing and shoving match ensued between defendant and the four intruders. According to the People's witnesses, defendant momentarily broke off the confrontation only to produce a handgun supplied by another employee. From this weapon was fired the shot that killed one of the four.

Defendant testified, to the contrary, that at 2:00 A.M. he was engaged in a heated argument with Charlotte Jordan, his girlfriend and mother of his child, over her alleged infidelity, when he noticed at least two men trying to push their way into the club. When he heard a shot, he tried to protect Jordan by pushing her inside. Defendant denied owning or possessing a gun at any time that night.

Sometime after defendant's arrest the following afternoon, Jordan apparently furnished defendant's counsel with an exculpatory statement supportive of defendant's version of the incident. However, by the time the trial commenced a year and a half later, defendant's relationship with Jordan had soured from intimacy to outright hostility. Defendant had to subpoena her, and she appeared only after counsel requested a material witness order.

At a conference with court and counsel that day, and a second two days later, Jordan repudiated her original statement and claimed that she would have to read the statements of other witnesses in order to refresh her recollection of what had actually happened. This request was rejected. The upshot of these meetings was that counsel declined to call Jordan to the stand on the ground that he would be presenting a perjured witness.

After the People's rebuttal case and at the court's precharge conference, the People sought a missing witness charge with regard to Jordan. The defense strenuously objected on the ground that she was not under defendant's control because she had terminated her relationship with him 16 months earlier,

had visited him only once in pretrial detention, and had advised him that she had a new boyfriend. The prosecutor responded that defendant's control of the witness could be inferred from her status as the mother of his child. The court ruled that it would (and did) charge in standard form that the jury could infer that if Jordan had been called as a witness by defendant, her testimony would not have supported his version of the facts. Armed with this ruling, the prosecutor argued in summation that if defendant's testimony had been true, Jordan would have been expected to verify it, and, as the mother of his child, would certainly have supported it if it were true.

It is well settled that control of a witness by a party is the essential basis for the adverse inference charge against that party (*see, e.g., People v Moore*, 17 AD2d 57, *cert denied* 371 US 838). However, there is no support, whether in logic, experience or law, for any presumption that a woman's status simply as the mother of a child somehow places her under the control of the child's father, from whom she is estranged (*cf., People v Wilson*, 64 NY2d 634; *People v Rodriguez,* 38 NY2d 95). Medea's slaughter of Jason's children is a very old story.

A witness is considered to be in the control of the party to whom he or she is favorably disposed. A demonstration that the witness in question is not under such control is sufficient to defeat the request for a missing witness charge (*People v Gonzalez*, 68 NY2d 424, 428). That principle would certainly apply to this case where the relationship between witness and party is one of hostility (*see*, 1 Charges to Jury Crim Case, 1998 Cum Supp, § 6:16, at 151).

Although not explicitly stating so, the majority is ready to assume that Jordan's first exculpatory version of the incident was false, and her later recantation, adverse to defendant, was true. We surely have no right to speculate either on what testimony an uncalled witness might have cared to supply, or, if there had been prior conflicting statements, which one is more consistent with the truth.

Furthermore, no defense counsel in a criminal case should be confronted with the Hobson's choice offered him here: either to proffer the testimony of a witness he believes to be perjured (which would be wholly adverse to his client's position, and thus in violation of two fundamental canons of ethics), or to refrain from this course and accept the heavy sanction (in the context of this case) of an adverse inference charge.

I am unable to conclude that this error was harmless, since it tipped the scales against defendant with respect to the crux

of his defense by means of an unheard voice endorsed by both the prosecutor and the court. Accordingly, I would reverse the conviction and remand for a new trial.

WILLIAMS, LERNER and SAXE, JJ., concur with NARDELLI, J. P.; WALLACH, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered September 14, 1995, affirmed. Motion seeking to leave to strike portions of respondent's brief denied.